[Civ. No. 4072. Third Appellate District.—May 27, 1930.]

IRENE DAVIDSON BUSH, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

■

W. I. Gilbert for Appellants.

Oliver O. Clark and Charles R. Nelson for Respondent.

FINCH, P. J.—The defendants have appealed from the judgment herein in favor of the plaintiff for personal injuries sustained by her in a railroad grade-crossing accident.

The accident occurred at a country crossing in Los Angeles County at the intersection of the Otterbien Road and the defendant's railroad. The railroad is straight for a distance of 1653 feet east of the crossing and then curves to the north. The elevation of the track at the crossing is about ten feet lower than at the westerly end of the curve. Adjacent to and along the north side of the railroad right of way is Valley Boulevard, stipulated to be "a heavily traveled boulevard." The Otterbien Road crosses the railroad in a northerly direction into Valley Boulevard. There were trees along the easterly side of the Otterbien Road, up to a point 63 feet south of the railroad tracks, of such density as to obstruct the view to the east.

The accident occurred on Sunday, October 11, 1925, at about 4:30 in the afternoon. As one of the company's passenger trains, the Sunset Limited, made up of ten cars, approached the crossing from the east at a speed variously estimated by the witnesses at from 50 to 75 miles an hour, the plaintiff, riding in a seven-passenger Buick sedan, which was "in A–1 condition," with her son, her father and mother and her brother, approached the crossing from the south. The brother owned the automobile and was driving it and the plaintiff was riding as his guest in the rear seat. Apparently they were all oblivious of the approach of the train. The company's fireman testified: "When we got within approximately five or six or seven hundred feet of the crossing—I am not quite positive about the distance because it was all so quick—I saw an automobile come up from the left; that is, coming from the south, headed north, out from behind some trees I should judge 75 or 100 feet from the railroad tracks, . . . and it seemed to me they were making about 12 or 13 miles per hour; and as they came up toward the crossing they seemed to be slowing down, and I surely thought they were going to stop. And when they got within six or eight feet of the track I saw the distance they had to travel and the speed they were making that they was not going to be able to stop, so I immediately gave a violent stop signal to the engineer to stop and also hollered up to him to stop, 'Hold it hard,' . . . Well, they were about 100 feet in front of us. We hit them." All in the automobile were killed except the plaintiff, who was seriously injured. A witness for the plaintiff who was driving his own automobile in an easterly direction along Valley Boulevard at the time of the accident, testified: "I had a pretty good view of the automobile as it went along, and it seemed as though it tried to stop. I couldn't say where it was when it seemed to try to stop. It was very close to the track, about 50 feet, and I think it tried to stop then. . . . As near as I can fix it, it is my judgment that these people drove 50 feet while the train was going 75." The foregoing is substantially all of the evidence in relation to the movements of the automobile immediately before the accident. The plaintiff testified: "After we left the house we went to an oil station at Hobart and Wilshire and got some gas. . . . I have no recollection of anything that oc-

curred thereafter during that day. I next recall coming home in an ambulance from the Pomona hospital. . . . I do not recall at all of having seen a railroad train on that day. I do not recall any of the circumstances whatsoever of the accident which occurred on that day.''

Eight witnesses, who were in positions to hear, testified that they did not hear any bell or whistle as the train approached the crossing, except the emergency whistle immediately before the accident. As many other witnesses testified that they heard the regulation whistle or bell or both. As said in appellant's reply brief, ''there being a conflict of evidence upon the question of the giving or failure to give the appropriate signals or warnings, it was for the jury to decide whether or not such signals were given, or that warning signals could be seen or heard.'' On appeal it must be presumed that the conflict in the evidence was resolved by the jury in favor of the plaintiff. (*Keena* v. *United Railroads,* 197 Cal. 148, 154 [239 Pac. 1061]; *Thompson* v. *Los Angeles etc. Ry. Co.,* 165 Cal. 748, 752 [134 Pac. 709]; *Vaca* v. *Southern Pac. Co.,* 91 Cal. App. 470, 474 [267 Pac. 346]; *Badostain* v. *Pacific Electric Ry. Co.,* 83 Cal. App. 290, 294 [256 Pac. 576]; *Jones* v. *Southern Pac. Co.,* 74 Cal. App. 10, 26 [239 Pac. 429].)

In addition to the estimates of witnesses there is other evidence tending to show that the train was moving at a high rate of speed. A witness for the defendants testified: ''I did notice sparks and dust coming from the engine just a few moments before he hit the crossing. I couldn't say the distance, because I didn't measure it, but I should say they were somewhere in the neighborhood of 1000 or 1200 feet from the crossing. As near as I can describe it, after the short blast of the whistle, why, the fire and dust began to fly from the rails, and as near as I could see, I thought he was pulling up the ties, and the fire flew from the wheels on the rails; looked just like one streak of lightning had hit the rails; and at the same time the dust rolled up so that you couldn't see the wheels of the car after that until he stopped.'' The train conductor testified: ''Before the train stopped it had gone past the crossing approximately 2000 feet, between 1800 and 2000 feet. The fireman testified: ''We couldn't have stopped any quicker, regardless of safety to passengers.'' Some of the witnesses testified

that the train was not brought to a stop until it reached a point considerably more than 2,000 feet west of the crossing. From the fact that the train traveled more than a half mile in making an emergency stop the logical inference arises that it was running at a very high rate of speed.

It may be conceded, for the purposes of this opinion, at least, that the driver of the automobile in which the plaintiff was riding was guilty of negligence.

■ Appellants contend that "the evidence discloses that respondent herself was guilty of contributory negligence." It is deemed sufficient to say that there is not the slightest evidence tending to sustain that contention.

■ It is contended that it was error to permit witnesses to testify to a conversation between the driver of the automobile and the plaintiff and others who rode in the machine, substantially to the effect that the driver invited the plaintiff to take the ride. The complaint alleges that the plaintiff was riding in the automobile at the time of the accident as the guest of her brother, and the answer denies that allegation. Proof of the invitation was certainly admissible as tending to show that the plaintiff was riding in the automobile as a guest. Such proof tended to show the relation between the driver and the plaintiff in the same manner that proof of the agreement between any other carrier and his passenger shows the relation between them.

■ The court instructed the jury substantially in the language of section 486 of the Civil Code, relating to ringing a bell and sounding a whistle on the approach of a railroad train to a crossing, and then stated:

"Whether or not a signal or warnings required by said code section, coupled with the rate of speed at which the train was running, was a reasonable warning, under the circumstances shown, to persons about to cross that track, is a question for you to determine after considering all of the evidence under the instructions and definitions you have been given as to what is ordinary care."

"It is for you to determine, from all of the evidence in this case, whether or not the defendant Southern Pacific Company maintained at the crossing in question, and at the place or places at said crossing where the same, if any, in the exercise of ordinary care should have been maintained, such warnings or devices, if any, for the reasonable protec-

tion of persons using said crossing, as, in the exercise of ordinary care, should have been maintained at said crossing by said defendant.''

The appellants contend that "the reasonableness of the signals or warnings, or the rate of speed or the maintenance of warning or devices were not questions to be determined by the jury," but by the legislature or the Railroad Commission.

"There are some authorities for the proposition that when a railroad company has followed the statutory directions as to giving signals, etc., it has discharged its whole duty in the premises, but the sounder doctrine is that the whole duty of a railroad company in respect of signaling the approach of its trains to highway crossings is not necessarily performed by a naked compliance with the statute in that behalf, and that such compliance does not necessarily relieve the railroad company from the necessity of taking such additional precautions as are essential to the safety of passers on the highway. . . . Neither the legislature nor the railroad commissioners can arbitrarily determine in advance what shall constitute ordinary care or reasonable prudence in a railroad company at a crossing, but each case must stand upon its own merits and be decided upon its own facts and circumstances; and for this reason it is usually a question for the jury whether or not precautionary measures in addition to the ringing of the bell or the sounding of the whistle ought to have been adopted to prevent a collision, and whether under the circumstances of the case, the company used reasonable care.'' (22 R. C. L. 998.)

"It is . . . held, in many of the states (in fact, the rule is well-nigh, if not quite, universal) that a railroad company, under certain circumstances, will not be held free from negligence even though it may have complied literally with the terms of a statute prescribing certain signals to be given and other precautions to be taken by it for the safety of the traveling public at crossings. . . . The reason for such rulings is found in the principle of the common law that everybody must so conduct himself and use his own property as that, under ordinary circumstances, he will not injure another in any way.'' (*Grand Trunk R. Co.* v. *Ives*, 144 U. S. 408 [36 L. Ed. 485, 12 Sup. Ct. Rep. 679]; see, also, *Panama R. R. Co.* v. *Pigott*, 254 U. S. 552 [60

A. L. R. 1096, 65 L. Ed. 400, 41 Sup. Ct. Rep. 199, see, also, Rose's U. S. Notes & Supp.] ; *Tisdale* v. *Panhandle & S. F. R. Co.*, (Tex. Com. App:) 228 S. W. 133, 16 A. L. R. 1273.)

The instructions under consideration state a rule of daily application in negligence cases. ■ Section 113, subdivision (a), of the California Vehicle Act (Stats. 1923, p. 517), provides: "Any person driving a vehicle on the public highways of this state shall drive the same at a careful and prudent speed not greater than is reasonable and proper, having due regard to the traffic, surface and width of the highway." This is but a statutory declaration of a common-law obligation which would be equally binding if omitted from the statute, and a failure to comply with it would constitute negligence, even though every express command of the statute were literally obeyed. (*Reaugh* v. *Cudahy Packing Co.*, 189 Cal. 335, 340 [208 Pac. 125]; *Gross* v. *Burnside*, 186 Cal. 467, 469 · [199 Pac. 780].) ■ While the violation of a regulatory statute or ordinance constitutes negligence as a matter of law, "it does not follow that merely because one has complied with the terms of a statute or ordinance that he is thereby absolved from negligence." (19 Cal. Jur. 634.) ■ The great weight of authority is to the effect that statutory regulations constitute only the minimum measure of care required of persons in charge of dangerous instrumentalities, and a railroad company, equally with the driver of an automobile, must, in a proper case, submit to the judgment of a jury the question of whether something more than the minimum of care was required under the facts and circumstances given in evidence.

■ Considering the high speed of the train, the quietness of its approach and the difficulty of stopping it on the downgrade, the upgrade along the Otterbien Road to the crossing, the obstructed view from that road to the east, and the position of the railroad cross-arms near the track and to the left of the road, it cannot be said as a matter of law that there is no evidence to which the instructions in question are applicable. It is highly probable, however, that the jury based the verdict on the testimony tending to prove that no bell was rung or whistle sounded, and the evidence warrants the conclusion that an emergency whistle

should have been sounded when the fireman first saw the automobile appear from behind the trees along the road.

The other grounds urged for a reversal of the judgment which have any semblance of merit are sufficiently disposed of by what had already been said. ▌ The complaint contains several specific allegations of negligence which the plaintiff made no effort to prove, and it is not to be presumed that the verdict of the jury was based on any of them.

The judgment is affirmed.

Thompson (R. L.), J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 26, 1930, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 24, 1930.